UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| GREATER GUIDE, INC. D/B/A AMERICAN SERVICE PETS | CIVIL ACTION |
| VERSUS | NO. 25-428 |
| SAPS LLC ET AL. | SECTION: "J"(5) |

## ORDER AND REASONS

Before the Court is a *Motion to Dismiss First Amended Complaint for Damages and Injunctive Relief* **(Rec. Doc. 48)** filed by Defendants SAPS LLC; Prevent ESA Fraud, Inc.; Prevent ESA Fraud ("PEF"); and Dominick Latino, III (hereinafter collectively "Defendants"). Plaintiff Greater Guide Inc. d/b/a American Service Pets ("ASP") filed an opposition (Rec. Doc. 64), to which Defendants replied (Rec. Doc. 74). Having considered the motions and legal memoranda, the record, and the applicable law, the Court finds that the motion should be **GRANTED**.

## FACTS AND PROCEDURAL BACKGROUND

At its most basic level, this litigation arises out of business competition between Plaintiff and Defendants in the emotional support animal industry. More specifically, Defendants mailed complaints to state regulatory agencies concerning independent mental health professionals who contracted with Plaintiff, and these complaints led the mental health professionals to terminate their contracts with Plaintiff.

1

Both Defendant SAPS and Plaintiff are companies that sell Emotional Support Animal ("ESA") certification letters by connecting consumers to contracted mental health care providers through their websites, and both companies appear to have nearly identical business models. Plaintiff operates a website, www.americanservicepets.com, through which individuals can apply for ESA certification. The individual fills out an online questionnaire, complete with a request for an evaluation from a contracted medical provider. Within this application, users must accept the terms and conditions of Plaintiff's website, which include an agreement not to submit any false information.

Defendant Dominick Latino, III serves as president and owner of Prevent ESA Fraud, which holds itself out as a nonprofit organization that does what its name suggests. He also serves as counsel for SAPS LLC, which owns the US Service Animals website, a direct competitor of Plaintiff. According to a quote from Mr. Latino on the Prevent ESA Fraud website, the goal of Prevent ESA Fraud is, in part, "to stop invalid ESA letters from harming people and businesses." The website also includes a quote from Matt Handal, who is listed as the founder of US Service Animals, which is the website owned by Defendant SAPS.

Plaintiff asserts that Defendants are connected entities, with Mr. Latino serving as legal counsel for SAPS and as president-owner of PEF. As a basis for its claims, Plaintiff alleges that Defendants conspired to harm Plaintiff's business. Specifically, Plaintiff claims Defendants used an investigator to submit at least thirty-one fictional online applications on Plaintiff's website which served as

2

Defendants' basis for state regulatory complaints. These complaints led to various mental health care providers terminating their agreements with Plaintiff. Further, Plaintiff alleges that Defendants lodged these complaints with regulatory agencies in retaliation after Defendants' lawsuit in Louisiana state court was dismissed.

Plaintiff insists that Defendants' actions (1) amount to civil conspiracy and fraud, (2) violated its website's terms and conditions, and (3) were designed to harm business competition. Plaintiff raises actions that include violations of the Sherman Antitrust Act, the Computer Fraud and Abuse Act, and civil Racketeer Influenced and Corrupt Organizations ("RICO") Act, in addition to a number of state-law claims.

The Court has original jurisdiction over Plaintiff's claims under the Computer Fraud and Abuse Act, the Sherman Act, and Plaintiff's civil RICO claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction under 28 U.S.C. § 1367 over the remaining state-law claims. Defendants now move to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6), averring that the *Noerr-Pennington* doctrine bars Plaintiff's claims generally and, in the alternative, contending that the individual claims lack merit. Plaintiff opposes.

## **LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The

factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "[D]etailed factual allegations" are not required, but the pleading must present "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. The court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). However, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436, 439 (5th Cir. 2009) (citation omitted).

## DISCUSSION

Defendants assert that the *Noerr-Pennington* doctrine bars all of Plaintiff's claims in the First Amended Complaint, and alternatively, that Plaintiff's claims fail as a matter of law. Because the Court is not persuaded that Defendants' affirmative defense bars all of Plaintiff's federal claims, the Court will address each of these claims separately.

In its opposition to Defendants' Motion to Dismiss, Plaintiff correctly notes that Defendants' invocation of the *Noerr-Pennington* doctrine constitutes an affirmative defense; however, Plaintiff misstates the legal consequences of this fact. Plaintiff relies on the Fifth Circuit's opinion in *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852 (5th Cir. 2000) to argue that *Noerr-Pennington* is "not a basis for dismissal at the pleading stage" (Rec. Doc. 64, at 5), but *Bayou Fleet* does not support this conclusion.

A primary issue in *Bayou Fleet* was whether the defendants had waived their

right to assert immunity under the *Noerr-Pennington* doctrine because they had failed to raise the defense timely. *Bayou Fleet*, 234 F.3d at 860. The district court had erroneously held that the *Noerr-Pennington* doctrine was not an affirmative defense, *id.*, but even despite this error, the Fifth Circuit affirmed the district court's decision to dismiss the plaintiff's claims, holding that defendants' conduct was immune under *Noerr-Pennington*, *id.* at 862–63.

Moreover, the Fifth Circuit has consistently held that "when a successful affirmative defense appears on the face of the pleadings, dismissal under Rule 12(b)(6) may be appropriate." *Kansa Reins. Co. v. Cong. Mortg. Corp. of Tex.*, 20 F.3d 1362, 1366 (5th Cir. 1994) (citing *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986)); *see also Stevens v. St. Tammany Par. Gov't*, 17 F.4th 563, 571 (5th Cir. 2021) (holding that "'[d]ismissal under Rule 12(b)(6) on *res judicata* grounds is appropriate when the elements of res judicata are apparent on the face of the pleadings'"); *Miller v. BAC Home Loans Servicing, L.P.*, 726 F.3d 717, 726 (5th Cir. 2013) (quoting *Kansa Reins.*, 20 F.3d at 1366, and concluding that the defendant "was permitted to raise the statute of frauds as a defense in its Rule 12(b)(6) motion"). Furthermore, "[w]hile the district court must accept as true all factual allegations in the complaint, . . . it need not resolve unclear questions of law in favor of the plaintiff." *Kansa Reins.*, 20 F.3d at 1366 (citations omitted).

Here, the availability of the *Noerr-Pennington* doctrine as an affirmative defense appears on the face of the pleadings and exhibits that Plaintiff attached thereto. Therefore, the Court will consider the applicability of this defense in

5

evaluating Defendants' Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6). However, the Court agrees with Plaintiff that the five exhibits Defendants attached to their Motion to Dismiss should be excluded under Rule 12(b)(6), and therefore, the Court has not considered these exhibits.

The Court will first address Plaintiff's claims under Sections 1 and 2 of the Sherman Act because these claims are based directly on the regulatory complaints Defendants made. Because the Court finds that the *Noerr-Pennington* serves to immunize Defendants' conduct regarding the filing of regulatory complaints with state agencies, the Court concludes that Plaintiff's claims under the Sherman Act should be dismissed.

### A. The *Noerr-Pennington* Doctrine and the Sherman Act

The *Noerr-Pennington* doctrine has developed from two Supreme Court cases: *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965). Under the *Noerr-Pennington* doctrine, a party who petitions the government for redress is generally afforded immunity from antitrust liability. *Bryant v. Mil. Dep't of Miss.*, 597 F.3d 678, 690 (5th Cir. 2010). "The essence of the doctrine is that parties who petition the government for governmental action favorable to them cannot be prosecuted under the antitrust laws even though their petitions are motivated by anticompetitive intent." *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*, 858 F.2d 1075, 1082 (5th Cir. 1988). However, the doctrine's immunity does not extend to petitioning activity that qualifies as a "sham." *Bryant*, 597 F.3d at 690.

6

Determining whether litigation, or other petitioning conduct, is a sham requires the Court to distinguish between objectively reasonable claims and those claims that "'lead[ ] the factfinder to conclude that the administrative and judicial processes have been abused.'" *Id.* (quoting *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972)). Courts employ a two-part test articulated by the Supreme Court in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.* to determine whether litigation is a sham. 508 U.S. 49, 60 (1993). The first step is to determine whether the action is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Id.* If the litigation is objectively meritless, then the court examines the litigant's subjective motivation and explores "whether the baseless lawsuit conceals 'an attempt to interfere *directly* with the business relationships of a competitor,' through the 'use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon.'" *Id.* at 60-61 (emphasis in original) (citations omitted).

The petitioning conduct at issue in the instant case are the complaints that Defendants made to state regulatory boards after creating allegedly fraudulent accounts and thereby engaging the services of third-party mental health professionals through ASP's website. ASP argues that the sham exception applies to Defendants' conduct, and thus, *Noerr-Pennington* does not protect it. Defendants, on the other hand, urge that the complaints they made regarding mental health care practitioners who provided services in conjunction with ASP were objectively reasonable and that a "reasonable litigant could realistically expect success on the

7

merits." *Id.* at 56.

Under the *Professional Real Estate* test, this Court must first evaluate whether Defendants' conduct was "objectively baseless." At this stage in the litigation, ASP only needs to allege facts that plausibly entitle it to relief. Plaintiff alleges that acting in concert, Defendants used an unknown investigator to set up fraudulent accounts on Plaintiff's website, American Service Pets, and through these accounts, were connected to independent, third-party mental health professionals. Then, according to Plaintiff's First Amended Complaint, Defendants, "using their ill-motivated and fraudulently obtained access to the Plaintiff's website and network of licensed providers," filed "a number of fake/manufactured and maliciously motivated regulatory 'complaints' with several State . . . regulatory bodies and agencies." (Rec. Doc. 31, at 2).

Throughout its pleadings, Plaintiff characterizes Defendants' complaints to state regulatory boards as "indiscriminate" and "baseless" (Rec. Doc. 31, at 17); as "fake complaints" (Rec. Doc. 31, at 26); as "fabricated" (Rec. Doc. 16); and as "objectively baseless" (Rec. Doc. 31, at 39). Furthermore, Plaintiff alleges that Defendants' complaints to state boards relied on "fictitious industry standards" (Rec. Doc. 31, at 4) that Defendants, namely Prevent ESA Fraud, unilaterally created and imposed, "without reference to local law or regulation" (Rec. Doc. 31, at 18), and that "no bona-fide grievances existed" (Rec. Doc. 31, at 16). In fact, Plaintiff defines what it means by "indiscriminate complaints" by saying, "As used herein, the term 'indiscriminate complaints' means complaints that rely solely on Defendants'

8

privately drafted 'Code of Conduct & Ethics' and may only reference state law or laws of other states." (Rec. Doc. 31, at 18).

One thing Plaintiff has not alleged, however, is that Defendants' complaints to state regulatory boards are untrue.

Attached to its First Amended Complaint, Plaintiff included a detailed list of the complaints Defendants mailed to state regulatory agencies (Exhibit 5: Detailed PEF Mailed Complaints List, Rec. Doc. 31-5). Of the eight complaints that Plaintiff included in this list, all but one of them is based on Defendants' (Prevent ESA Fraud and Dominick Latino III specifically) allegation that an independent mental healthcare provider issued an ESA certification letter to an "investigator" based solely on an online evaluation. (Rec. Doc. 31-5, at 2). In its pleadings, Plaintiff does not refute this allegation.

While the Court agrees with Plaintiff that Defendants' complaints "were based entirely on fake or fraudulent consumer/patient interactions with ASP's systems and providers" (Rec. Doc. 31, at 21), that does not mean that the complaints themselves were "objectively baseless." Assuming that Defendants' allegations were true, these complaints are not based solely on a standard that Defendants unilaterally created and imposed. Instead, for the complaint filed in Louisiana, for example, the allegation is based on state law.[1]

---

[1] Based on Plaintiff's exhibit (Rec. Doc. 31-5), Defendants mailed complaints to state regulatory boards in the following states: Arizona, California, Florida, Louisiana, Texas, and Washington. Similarly to Louisiana's statute, Cal. Health & Safety Code § 122318 prohibits a health care practitioner from providing documentation "relating to an individual's need for an emotional support dog unless the health care practitioner," among other requirements, "establishes a client-provider relationship with the individual for at least 30 days prior to providing the documentation

In 2024, the Louisiana Legislature passed the Louisiana Support and Service Animal Integrity Act. *See* La. Stat. Ann. § 46:1971 *et seq.* Section 1974 of the Act establishes that healthcare providers are prohibited from producing "documentation relating to an individual's need for a support animal unless" the provider complies with a list of six requirements, two of which are that the healthcare provider must "engage[] with an individual in person or remotely in at least two sessions before issuing documentation determining that the individual requires a support animal," and "perform[] a clinical evaluation of an individual no less than thirty days before producing documentation regarding the individual's need for a support animal." La. Stat. Ann. § 46:1974(A)(5), (6). Based on this statutory scheme and a similar statute in California, for example, Plaintiff's assertion that Defendants' complaints to state regulatory boards relied solely on Prevent ESA Fraud's unilaterally created standards is unfounded.

Therefore, Prevent ESA Fraud and Dominick Latino's complaints to state regulatory boards were grounded in standards that are more widely accepted than Plaintiff suggests. Based on the summaries that Plaintiff provided, these complaints appear to have a basis in at least some states' laws, and thus, the complaints

---

requested regarding the individual's need for an emotional support dog" and "[c]ompletes a clinical evaluation of the individual regarding the need for an emotional support dog." Cal. Health & Safety Code § 122318(a)(3)(B), (a)(4).

Under Florida law, a request for accommodation of an emotional support animal under the Fair Housing Act must be "reasonable," and an "emotional support animal registration of any kind, including, but not limited to, an identification card, patch, certificate, or similar registration obtained from the Internet is not, by itself, sufficient information to reliably establish that a person has a disability or a disability-related need for an emotional support animal." Fla. Stat. § 760.27. While not all states have enacted laws that lay out requirements for a healthcare provider and emotional support animal letters, the cited statutes suggest that the complaints that Defendants filed were not based solely on unilaterally created standards.

10

presumably have an objective and reasonable basis *unless* they contain untrue allegations.

Plaintiff has had the opportunity in more than one pleading to assert that Defendants' complaints were false, but Plaintiff has not done so. Instead, Plaintiff has made conclusory statements regarding the "indiscriminate" and "baseless" nature of Defendants' complaints without providing factual support. Therefore, it is reasonable to assume that Plaintiff cannot make this showing. Plaintiff's "continued iteration that [Defendants'] actions are objectively baseless does not make them so." *721 Bourbon, Inc. v. Willie's Chicken Shack, LLC*, 2020 WL 587886 (E.D. La. 2020). Under these circumstances, Defendants have demonstrated that their complaints to state regulatory boards were not "objectively baseless," and therefore, the sham exception to *Noerr-Pennington* immunity would not apply.

Moreover, the fact that Defendants' anonymous "investigator" was able to create fictitious accounts on Plaintiff's website and presumably receive ESA letters from Plaintiff's affiliated independent mental health professionals based on these fictitious personas seems to confirm the complaints Defendants made to state boards.

In sum, the availability of Defendants' affirmative defense, the *Noerr-Pennington* doctrine, appears on the face of Plaintiff's First Amended Complaint and attached exhibits, and therefore, this defense may be considered in ruling on Defendants' Motion to Dismiss. Furthermore, Defendants have met their burden of proving that the "sham exception" to *Noerr-Pennington* does not apply in this case because their complaints to state regulatory agencies were not "objectively baseless,"

and therefore, Defendants' petitioning conduct is immunized under *Noerr-Pennington*. Finally, the *Noerr-Pennington* doctrine arose specifically in the antitrust context, and accordingly, this immunity acts to bar Plaintiff's claims under the Sherman Act. Therefore, these claims are dismissed.

The Court will now consider Plaintiff's claims under the Computer Fraud and Abuse Act.

### B. Computer Fraud and Abuse Act

Plaintiff also claims that Defendants violated the Computer Fraud and Abuse Act ("CFAA") when they allegedly accessed Plaintiff's website (American Service Pets, www.AmericanServicePets.com) "without authorization" multiple times between January of 2023 and September 30, 2024. Specifically, Plaintiffs allege that on approximately thirty-one occasions, Defendants created fraudulent customer profiles with falsified information, including fictitious names, birthdates, addresses, and billing information, in order "to obtain medical services and confidential business information." (Rec. Doc. 31, at 33). Furthermore, Plaintiff claims that Defendants created these fictitious accounts in express violation of its website's terms and conditions.

In their Motion to Dismiss, Defendants do not deny this conduct but instead acknowledge that the investigations conducted by Defendant Prevent ESA Fraud ("PEF") "involve[d] the creation of user profiles to access websites selling ESAs for the purpose of testing compliance with applicable legal and professional standards for ESA issuance." (Rec. Doc. 48-1, at 5). According to its self-professed business

model, when PEF "determines there is non-compliance, then PEF files complaints with the appropriate state boards." *Id.*

Through this investigative technique, Plaintiff alleges that Defendants violated three provisions of the CFAA. First, Section 1030(a)(2) of the CFAA imposes criminal and civil liability on "[w]hoever . . . intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains— . . . (C) information from any protected computer." 18 U.S.C.A. § 1030(a)(2)(C). Next, Plaintiff asserts that Defendants violated 18 U.S.C.A. § 1030(a)(4), which imposes liability on "[w]hoever . . . knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access," thereby furthering the fraud and obtaining "anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period." 18 U.S.C.A. § 1030(a)(4). Finally, Plaintiff claims that Defendants also violated § 1030(b) by conspiring or attempting "to commit an offense under subsection (a)." *Id.* § 1030(b).

What neither party has acknowledged, however, is that the Computer Fraud and Abuse Act is primarily a criminal statute, and it is 18 U.S.C.A. § 1030(g) that provides the civil cause of action under the Act. This section begins as follows: "Any person *who suffers damage or loss* by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." *Id.* § 1030(g) (emphasis added). Furthermore, the statute explicitly defines "damage" as "any impairment to the

integrity or availability of data, a program, a system, or information," *id.* § 1030(e)(8), and "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service," *id.* § 1030(e)(11).

In the instant case, Plaintiff claims that Defendants' alleged violation of the CFAA "caused a loss to Plaintiffs [sic] in excess of $5,000 during a one-year period . . . including but not limited to costs associated with identifying and responding to fraudulent activity, enhancing security measures, and addressing harm to business operations." (Rec. Doc. 31, at 34). However, Plaintiff makes these conclusory allegations without providing any substantive support. Furthermore, based on Plaintiff's First Amended Complaint and its opposition to Defendants' Motion to Dismiss, the "harm to business operations" that Plaintiff suffered was not of "the type unauthorized users cause to computer systems and data," but instead, Plaintiff alleges that Defendants' complaints to state regulatory boards caused its loss because these complaints led independent mental health professionals to terminate their contracts with Plaintiff. This loss is not the kind of "technological harm" anticipated under the CFAA, nor is it one for which the CFAA provides a civil remedy.

Moreover, Plaintiff discovered that Defendants had violated its website's terms and conditions only after Defendants filed complaints with state regulatory agencies. In other words, Plaintiff's costs to "identify[] and respond[] to fraudulent activity"

14

were directly related to the complaints Defendants made to state regulatory agencies, conduct which is immune under the *Noerr-Pennington* doctrine.

Even accepting all of Plaintiff's well-pled allegations as true and drawing all reasonable inferences in Plaintiff's favor, Plaintiff's claims to relief under the CFAA are not plausible on their face.

### C. Racketeer Influenced and Corrupt Organizations Act

Plaintiff also brings claims against Defendants under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). RICO statute 18 U.S.C. § 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Plaintiff alleges that Defendants operated as an association-in-fact enterprise, and that this enterprise committed the predicate acts of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343 "with the shared purpose of suppressing ESA-PSA certification market presence through fraud, CFAA violations, and sham regulatory complaints." (Rec. Doc. 31, at 41).

In response, Defendants assert that Plaintiff has failed to state valid RICO claims on three primary grounds: (1) Plaintiff's First Amended Complaint "alleges no distinction between the alleged enterprise and the persons who formed that enterprise," (Rec. Doc. 48-1, at 34); (2) Plaintiff has not pleaded its claims regarding Defendants' predicate acts with particularity; and (3) Plaintiff lacks standing based

on a lack of injury.

In accord with the Supreme Court's decision in *Sedima, S.P.R.L. v. Imrex Co*, 473 U.S. 479 (1985), the Fifth Circuit has made clear that "a violation of § 1962(c) 'requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Montesano v. Seafirst Com. Corp.*, 818 F.2d 423, 424 (5th Cir. 1987) (quoting *Sedima*, 473 U.S. at 496). The RICO statutory scheme defines a "pattern of racketeering activity" as requiring "*at least two acts* of racketeering activity." 18 U.S.C. § 1961(5) (emphasis added).

Here, Plaintiff alleges that Defendants committed two predicate acts: wire fraud and mail fraud. Specifically, Plaintiff asserts that Defendants committed mail fraud when they mailed their complaints against independent mental health professionals to the various state regulatory boards. However, because this conduct is protected by *Noerr-Pennington* immunity, Plaintiff's complaint does not make a plausible showing on its face of *two* predicate acts. Therefore, assuming that Plaintiff could prove that Defendants committed wire fraud, Plaintiff would not be able to meet its burden in proving the elements of its RICO claims.

Furthermore, because the Court concludes that all of Plaintiff's claims under federal law should be dismissed, the Court will no longer have supplemental jurisdiction over Plaintiff's state-law claims.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' *Motion to Dismiss First*

*Amended Complaint for Damages and Injunctive Relief* **(Rec. Doc. 48)** is **GRANTED**, and that Plaintiff Greater Guide, Inc.'s federal claims against SAPS LLC; Prevent ESA Fraud, Inc.; Prevent ESA Fraud; and Dominick Latino, III are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiff's state law claims against Defendants are **DISMISSED WITHOUT PREJUDICE**.

New Orleans, Louisiana, this 31st day of October, 2025.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE